UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel., RANDOLPH PETERSON and TRI-CITY RAILROAD COMPANY, LLC, <br><br>                                    Plaintiffs, <br><br>        v. <br><br> PORT OF BENTON COUNTY, et al., <br><br>                                    Defendants. | NO. 2:17-CV-0191-TOR <br><br> ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST THE CITY OF RICHLAND |

BEFORE THE COURT is Plaintiffs Randolph Peterson and Tri-City Railroad

Company, LLC's Motion for Partial Summary Judgment Against the City of Richland

(ECF No. 87), Motion to Strike (ECF No. 104), and Motion to Expedite (ECF No.

105). These matters were submitted for consideration without a request for oral

argument. Defendants the City of Richland and the Port of Benton filed a Response.

The Court has reviewed the record and files herein, and is fully informed.

Plaintiffs' request to strike Defendant City of Richland's Sur-Reply and corresponding request to expedite (ECF Nos. 104; 105) are **denied as moot**, as the Court does not rely on the complained of briefing for this Order. For the reasons discussed below, the Motion for Partial Summary Judgment (ECF No. 87) is **denied**.

## BACKGROUND

The pending motion for summary judgment concerns alleged retaliation by the City of Richland against Plaintiff Tri-City Railroad Company, LLC ("TCRY") for successfully petitioning the United States Surface Transportation Board ("STB") for relief from the City of Richland's efforts to create an at-grade crossing over railroad tracks leased by TCRY. As discussed more fully below, TCRY alleges the City of Richland retaliated by creating a "Southern Connection Options List" and by threatening suit against the Union Pacific Railroad ("UP"), among other things. The following provides the context for Plaintiffs' allegations.[1]

//

---

[1] Where disputed, the facts and inferences are construed in favor of the non-moving party—although the Court notes that there are few factual issues in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (in reviewing a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor").

1. **TCRY's leasehold interest in tracks owned by the Port of Benton**

The Port of Benton (the "Port") owns approximately 16 miles of railroad trackage, which is generally referred to as the "Southern Connection." ECF No. 97 at 2, ¶ 4. In 2002, TCRY began leasing the trackage from the Port and agreed to maintain the tracks and pay monthly rent, *inter alia*. ECF No. 88-3. Relevant to the pending motion, the southern end of the track runs between Gage Boulevard and Tapteal Drive, passing through the City of Richland and into the City of Kennewick, at what is called the "Richland Junction".

2. **Center Parkway crossing – initial efforts**

In 2001, before TCRY acquired its leasehold, the City of Kennewick and the City of Richland had already "began a coordinated effort" to create an at-grade railroad crossing (the "Center Parkway Extension") over two sets of tracks—one set owned by the Port (and subsequently leased to TCRY) and the other owned by UP. ECF No. 95 at 4; 98 at 2-3, ¶ 2; ECF No. 93-2 (2001 agreement between City of Kennewick and City of Richland regarding preparation for Center Parkway crossing); *see* ECF No. 93-4. The crossing was part of a plan between the City of Kennewick and the City of Richland to connect commercial retail centers between the two cities by extending Center Parkway Road over the tracks, connecting Gage Boulevard and Tapteal Drive. ECF No. 95 at 4. Because the plans called for an at-grade crossing over the Port's

tracks, "the proposed project was hostile to the Port's property interests" as owner and TCRY's leasehold property interest. ECF No. 95 at 4-5.

In April of 2004, the City of Kennewick, in conjunction with the City of Richland, petitioned the Washington State Utilities & Transportation Commission ("WUTC") to obtain "an at-grade crossing of Center Parkway over the Union Pacific railroad spur west of the Richland Junction[.]" ECF No. 89 at 3, ¶ 4. In November 2005, at UP's request, Kennewick's petition to cross TCRY tracks at Center Parkway was consolidated with the first petition. ECF No. 89 at 3, ¶ 5.

According to the Port, "[t]he Port recognized that Richland and Kennewick had compelling arguments that could likely support efforts to condemn the Port's property in favor of extending Center Parkway over the Port-owned railroad track." ECF No. 95 at 5; *see* ECF No. 88-4 (petition). As such, "[r]ather than risk losing the ability to participate in how its interests would be impacted, in 2006, the Port entered into a Railroad Crossing Agreement [] with Richland and Kennewick" where "the Port agreed to grant the cities a crossing easement over its trackage" and the cities agreed "to obtain authority for the crossing from the Port's lessee, TCRY, or to obtain legal authority (e.g., authority from the court) for the proposed crossing." ECF No. 95 at 5-6.

"In 2007, WUTC rejected Kennewick's . . . petitions for the at-grade crossing over UP and TCRY tracks at Center Parkway[.]" ECF No. 89 at 4, ¶ 7.

Over the course of the next few years, the City of Richland continued to pursue its goal of securing the Center Parkway crossing. *See* ECF No. 89 at 4-8, ¶¶ 8-25. In particular, the City of Richland entered into a Standard Form Railroad Track Use Agreement ("SFRTUA") with UP in April of 2011. ECF No. 89 at 7, ¶ 15. The agreement included the declaration that "the City desires that all railroad interchange operations at Richland Junction be permanently eliminated[.]" ECF No. 89 at 5, ¶ 16. As part of the agreement, UP agreed to "secure[] all agreements necessary with Tri-City Railroad Company, LLC . . . to permanently relocate the UP/Tri City Railroad interchange from Richland Junction and the path of Center Parkway." ECF No. 89 at 7, ¶ 22. UP also reserved the right "to name an agent to handle UP rail traffic to and from industries located along the Track" and "named TCRY as its agent to handle UP rail traffic to and from industries located on the Horn Rapids Rail Spur." ECF No 89 at 8, ¶¶ 24-25.

3. **Second WUTC petition for crossing; TCRY's "protected" conduct**

On April 8, 2013, the City of Kennewick filed another petition with the WUTC to construct an at-grade rail crossing at Center Parkway. ECF No. 89 at 8, ¶ 27. On May 31, 2013, the City of Richland filed a motion to intervene with the WUTC in support of the City of Kennewick's petition; the motion was granted on June 4, 2013. ECF No. 89 at 8, 28. In November, 2014, TCRY received notice of the petition. ECF No. 89 at 9, ¶ 29. The WUTC "approved the extension of Center Parkway between

Kennewick and Richland" and the Superior Court for the County of Benton, Washington affirmed the WUTC orders on December 9, 2014. *See Tri-City R.R. Co. v. State of Washington*, Benton County Cause No. 14-2-07894-8; ECF No. 88-24 at 2.

On March 19, 2015, TCRY petitioned the United States Surface Transportation Board (STB) "for a declaratory order seeking preemption of Kennewick and Richland's efforts at Richland Junction to protect its railroad operations and leasehold rights." ECF No. 89 at 9, ¶ 30 (emphasis own).

"On May 7, 2015, Kennewick and Richland filed a petition for condemnation with the Benton County Superior Court for an easement across TCRY tracks at Richland Junction for an at-grade-crossing." ECF No. 89 at 9, ¶ 31.

"On September 12, 2016, the STB issued a declaratory order preempting Kennewick and Richland's attempt at condemnation and denying the City of Richland's request for an at-grade crossing[;] Richland subsequently appealed the STB declaratory order to the Ninth Circuit Court of Appeals." ECF No. 89 at 10, ¶ 33.

4. **Southern Connection Options List**

Plaintiffs assert the City of Richland, through the firm Fletcher & Sippel, created the so-called "Southern Connection Options List" out of retaliation for TCRY petitioning the STB. The Port paints a much different picture—according to the Port, the Port hired the firm Fletcher & Sippel to create the Options List and City of Richland played no part in its formation. ECF No. 95 at 9-10. The Port further asserts

the Options List had nothing to do with the Center Parkway project, and provides an explanation as to the origin and purpose of the Options List, as detailed below.

According to the Port, the Horn Rapids Industrial Park—an industrial area located at the opposite end of the Southern Connection from the Richland Junction (approximately 12 miles away)—began seeing economic growth in 2012. ECF No. 95 at 8. Due to the expected increase in rail traffic, the Port hired a railroad consulting firm, Tangent Services, Inc., to advise the Port on how to best utilize its railroad assets to support economic development. ECF No. 95 at 8.

Around this time, the Port "began questioning whether TCRY was meeting its lease obligations and properly maintaining the Port's trackage" and these "concerns were compounded by the fact that TCRY refused to provide the Port with any maintenance records" while "representing that it was not required to maintain the track at any specific Federal Railroad Administration standard, which the Port disputed." ECF No. 95 at 9. "The Port decided to consult with an attorney who focused on railroad law to advise the Port on the terms of the lease, including TCRY's maintenance obligations" and "[a]s the Port's concerns about TCRY grew, in early 2016, the Port asked Fletcher & Sippel to work with Tangent to analyze the Port's contractual rights and obligations for its rail line, including its lease with TCRY." ECF No. 95 at 9.

According to the Port, "[b]etween January and August 2016, Tangent and

Fletcher & Sippel collected information and conducted the requested analysis, which included drafting a memo entitled 'The Southern Connection Options List'." ECF No. 95 at 9-10.

The Port received the Southern Connection Options List on or about August 31, 2016. ECF No. 95 at 10. The Options List "contained 15 different options for the Port to consider – everything from selling the trackage, to developing alternative funding sources, to evicting TCRY, to doing nothing." ECF No. 95 at 10. According to the Port, it "did not adopt any of the options other than to continue with the status quo – any other option would have required a vote of the Port Commissioners, which did not happen." ECF No. 95 at 10.

The Port avers that "[t]his work was done solely for the Port[,] was never meant for dissemination of any kind[,]" and that "[t]he Port did not share the Options List (or any information about the analysis it had requested) with Richland[,]" noting that "the Options List was headed in bold with the phrase 'Privileged and Confidential Attorney-Client Communication' and the Port considered it confidential legal analysis." ECF No. 95 at 10. According to the Port, TCRY only received the Options List after submitting a public record request in the summer of 2017. ECF No. 95 at 11. On August 8, 2017, TCRY forwarded the Options List to the City of Richland; the City of Richland was not aware of the list beforehand. ECF Nos. 91 at 10; 95 at 11.

According to the Port, "[a]fter TCRY received the list, it demanded the Port

identify what option the Port intended to adopt" but "[t]he Port repeatedly told TCRY that the list was nothing more than an analysis from an outside consultant and that the Port had no plan to undertake any of the options."  ECF No. 95 at 11.

5.  **City of Richland gives UP notice of breach due to TCRY opposition**

On July 26, 2017, Wimbish sent an e-mail to UP's attorney Jeremy Berman.  In the e-mail, Wimbish relayed the City of Richland's stance that the UP is in breach of the 2011 SFRTUA between the City of Richland and UP.  ECF No. 88-37; *see supra*. In the e-mail, Wimbish notes that the SFRTUA requires UP *and its agents* (which includes TCRY) to not oppose the Center Parkway project.  ECF No. 88-37 at 3.  As such, Wimbish concludes, UP was in breach of their agreement "due to TCRY's clearly-stated and ongoing opposition to the Center Parkway project."  ECF No. 88-37 at 3.

6.  **Procedural history**

Plaintiffs brought this action on June 5, 2017, asserting a *Qui Tam* action under 31 U.S.C. §§ 3729-3737 based on alleged "false or fraudulent claims" and "false records and statements" used "to obtain payment (and double payment or approval for payment in violation of the Federal False Claims Act . . . ."  ECF No. 1 at ¶ 5.1. Because Plaintiffs asserted a Federal False Claims Act cause of action, the United States of America was provided with notice and an opportunity to intervene.  *See* ECF No. 2.  On May 25, 2018, the United States of America declined to intervene.  ECF

Nos. 9; 10.

Plaintiffs filed an Amended Complaint (ECF No. 6) on April 2, 2018, and a Second Amended Complaint (ECF No. 13) on June 13, 2018. In the First Amended Complaint, Plaintiffs reasserted the original *Qui Tam* claim and asserted a host of new actions, including, *inter alia*, claims that Defendants the Port and the City of Richland retaliated against TCRY based on TCRY's protected activity. In the Second Amended Complaint, Plaintiff merely adds more detail to the underlying allegations, but the causes of action remained the same. *Compare* ECF No. 6 *with* ECF No. 13.

Recently, Peterson and TCRY requested the Court enter partial summary judgment holding the Port "liable for retaliating against Peterson and TRCY (for associating with Peterson) for Peterson's petition against the Port for unconstitutional conduct." ECF No. 61 at 2. The Court denied the motion. ECF No. 85.

Now, Peterson and TCRY request the Court enter partial summary judgment holding the City of Richland liable for alleged retaliation based on TCRY's petition to the STB. ECF No. 87. This Motion is now before the Court.

## STANDARD OF REVIEW

A movant is entitled to summary judgment if "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An

issue is "genuine" where the evidence is such that a reasonable jury could find in favor of the non-moving party. *Id.* The moving party bears the "burden of establishing the nonexistence of a 'genuine issue.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). "This burden has two distinct components: an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party." *Id.*

Per Rule 56(c), the parties must support assertions by: "citing to particular parts of the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or than an adverse party cannot produce admissible evidence to support the fact." Only admissible evidence may be considered. *Orr v. Bank of America, NT & SA*, 285 F.3d 764 (9th Cir. 2002). The nonmoving party may not defeat a properly supported motion with mere allegations or denials in the pleadings. *Liberty Lobby*, 477 U.S. at 248. The "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." *Id.* at 255. However, the "mere existence of a scintilla of evidence" will not defeat summary judgment. *Id.* at 252.

## DISCUSSION

Plaintiffs request summary judgment against the City of Richland for violation of Plaintiff TCRY's First Amendment right to be free from retaliation against protected free expression. ECF No. 87. Defendants the City of Richland and the Port

of Benton oppose the Motion, arguing Plaintiffs have not demonstrated that the City of Richland took any adverse action against TCRY in retaliation for protected speech, among other things. ECF Nos. 91; 95. The Court agrees with Defendants.

"To state a claim for First Amendment retaliation against a government official, a plaintiff must demonstrate that '(1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action.'" *Mulligan v. Nichols*, 835 F.3d 983, 988 (9th Cir. 2016) (quoting *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010)).

Plaintiffs argue TCRY engaged in protected speech when "TCRY brought a petition before the STB to enforce its leasehold rights and prevent an unlawful condemnation of its property." ECF No. 87 at 12. Plaintiffs assert the City of Richland retaliated against TCRY because of this protected conduct. In support, Plaintiffs point to (1) the Southern Connection Options List, ECF No. 87 at 6; (2) the City of Richland informing UP of its breach of contract based on TCRY's opposition to the Center Parkway crossing, ECF No. 87 at 10; and (3) statements in e-mails written by Wimbesh (*i.e.* referring to TCRY as "TCRY f'er", stating "I don't want to give them a damn thing", and stating "this is the last of 'em'"), ECF No. 87 at 10; ECF No. 101 at 6. The Court finds Plaintiffs have not met their burden in requesting

summary judgment, as the evidence does not demonstrate the necessary retaliatory

intent, especially under the lens of summary judgment.

1. **Options List**

Plaintiffs' motion relies heavily on their contention that the City of Richland,

through the firm Fletcher & Sippel, created the "Southern Connection Options List"

out of retaliation for TCRY petitioning the STB for a declaratory order. ECF No. 89 at

10, ¶ 34. Remarkably, however, Plaintiffs do not provide any evidence that the City of

Richland had any role in creating the Options List.

Contrary to Plaintiffs' assertions otherwise, the evidence demonstrates the City

of Richland had nothing to do with the Options List and the Options List had nothing

to do with the Center Parkway crossing. As the City of Richland notes, "on March 11,

2016, Mr. Wimbish sent an email to two Port employees and several Tangent Services

employees—*but no one at the City*—explaining: 'I am working . . . in support of

Tangent Services, Inc., to develop and to *provide to the Port of Benton* (the 'Port') a

list of possible options for the future use of the so-called 'Southern Connection' . . . .'"

ECF No. 91 at 8 (emphasis own). Further, in the e-mail, Wimbish refers to the

commercial and legal relationship among the Port, BNSF, TCRY and UP, but does not

mention the City of Richland or request any information related to the City of Richland

or the Center Parkway crossing. *See* ECF Nos. 88-25 at 2; 91 at 9-10. In their Reply,

Plaintiffs attempt to tie the City of Richland to the Options List by asserting that (1)

"Tangent, the City of Richland, and the Port of Benton met on September 1, 2016 and discussed TCRY and options" and (2) "Tangent's bill to analyze ending TCRY was split between the City of Richland and the Port of Benton." ECF No. 101 at 5. In support, Plaintiffs rely on a disputed e-mail and a billing statement, and even if the Court were to consider this, it only shows the parties met with the firm, not that they discussed the Options List.

Importantly, even if the City of Richland took part in creating the Options List or otherwise discussed ways of dealing with TCRY, there is still no concrete evidence this was done out of retaliation (let alone out of retaliation for petitioning the STB), especially bearing in mind the fact that the Parties have a long, contentious history. Notably, Plaintiffs assert that "Fletcher & Sippel . . . laid out a plan of retaliation via email that was *expressly intended* to retaliate against TCRY for asserting its right[,]" ECF No. 87 at 13 (emphasis own), but Plaintiffs conspicuously fail to identify the allegedly "express" language of retaliatory intent. Plaintiffs also assert that the City launched its plan of sabotage (i.e., the Options List) two days after the STB ruled in TCRY's favor, ECF No. 87 at 14, but the timing is a red herring. Although the STB ruled on August 12, 2016 and the Options List was allegedly distributed to the Port around that time, it is not disputed that (1) the Options List was a product of several months of planning and work, beginning in January of that year, and (2) TCRY filed the petition in March of 2015—undermining Plaintiffs attempt to imply retaliation

based on timing.

Finally, merely discussing options – even if discussing how to retaliate – does not amount to retaliation absent concrete action. *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 n.1 (9th Cir. 2010) (an adverse act is "an act that is reasonably likely to deter [the plaintiff] from engaging in constitutionally protected speech." (quoting *Coszalter v. City of Salem*, 320 F.3d 968, 970 (9th Cir. 2003)). It is undisputed TCRY only learned of the Options List after receiving the records via a public records request, so the Options List cannot be viewed as an adverse action.

### 2. City of Richland informing UP of breach

Plaintiffs point to one concrete action taken by the City of Richland. In July 2017, Wimbish wrote to UP's attorney Berman informing him that UP was in breach of the 2011 SFRTUA between the City of Richland and UP based on TCRY's opposition to the Center Parkway crossing (the 2011 SFRTUA required UP and its agents to not object to the Center Parkway project, as noted above). It is true the City of Richland informed UP of its breach based on TCRY's objection to the project. However, there is nothing to suggest the City of Richland did so out of retaliation for TCRY's STB petition, as opposed to pursuing the long-stated goal of installing the Center Parkway crossing.

Importantly, TCRY's protected conduct – filing the petition with the STB in 2015 – occurred long after the City of Richland and UP entered the 2011 SFRTUA.

Although the City of Richland pursued its contractual rights *after* TCRY filed the STB petition, (1) the relevant e-mail was sent approximately two years after TCRY filed the petition and one year after the STB ruled in TCRY's favor—a significant gap in time between the protected conduct and the complained-of action, and (2) the conduct is entirely consistent with plans dating back to 2001 and accords with the 2011 SFRTUA declaration stating that "the City desires that all railroad interchange operations at Richland Junction be permanently eliminated to facilitate commercial development and improve vehicular traffic movement in the area[.]" ECF Nos. 89 at 5, ¶ 16; 88-17 at 2.

Under the lens of summary judgment, the Court cannot say the notice of breach was sent out of retaliation.

3. **Rejection of TCRY offer of acceptance; last of 'em e-mail**

Plaintiffs argue the "undisputed rejection of TCRY's acceptance of the Center Parkway Project on September 12, 2017" is evidence of retaliation. ECF No. 101 at 5. Plaintiffs appear to be referencing TCRY's offer to accept the City of Richland's proposed Center Parkway crossing design, where counsel for TCRY, William C. Schroeder, wrote to Berman, stating: "the City's most recent proposed design as to Center Parkway is acceptable, conditioned upon payment of my client's costs and fees." ECF Nos. 93 at 18, ¶ 61; 88-42. As for the "rejection", Plaintiffs point to an e-mail sent on September 13, 2017 from Wimbish to Berman where Wimbish refers to

TCRY as "TCRY F-ers" and states "I don't want the City to give [TCRY] a damn thing aside from funds related to crossing upkeep and signal maintenance." ECF No. 101 at 6.

The e-mail by Wimbish was written in response to Berman e-mailing Wimbish in order to (1) inform him that TCRY found the design proposal for Center Parkway acceptable and (2) ask whether Wimbish or the City of Richland heard anything about this from TCRY. ECF No. 88-44 at 3. In response, Wimbish wrote:

> I've not heard anything about movement on Center Parkway. That part of your message is news to me.
>
> What I do know is that TCRY has, to my client's surprise softened its stance on the Duportail crossing, as you have mentioned. TCRY is still holding out for a cash payout, as it always does, even though I believe that Duportail only involves modification to an existing crossing. I understand that TCRY's low-six-figure demand is a serious change in posture, and it may well be that the City would be inclined accept on Duportail in the interest of evading a larger dispute with the short line. Incidentally, I don't think Richland should have to pay TCRY (a non-owner, tenant railroad) anything for Duportail. I am recommending that Richland hold off on any further negotiations on Duportail until we hear more.
>
> My guess is that TCRY will demand money (again, low six figures or so, possibly more) for Center Parkway, just agree to the crossing without putting up a fight. I don't want the City to give them a damn thing aside from funds related to crossing upkeep and signal maintenance (as compensation for the upkeep and maintenance of the crossing and signals strike me as reasonable). You can rest assured that those TCRY F-ers will, after settlement, move on to the tactic of purposely blocking the new Center Parkway crossing just to annoy the City and make some new demand, such as exclusive access to the Horn Rapids Spur (something they've tried to secure before, by the way).

1    ECF No. 88-44 at 2-3.

2         According to Plaintiffs, the "City of Richland's refusal in September 2017 to not

3    give[] 'a damn thing' to TCRY was motivated by its stated desire to chill TCRY's

4    speech." ECF No. 101 at 6. Plaintiffs simply point to ECF No. 89 at 17, ¶ 60, which

5    is merely a short recitation of a portion of the underlying e-mail (included above).

6    Upon a more complete review, the e-mail merely reflects the desire that TCRY not

7    oppose the Center Parkway crossing, which is harmless in light of the context.

8    Plaintiffs also grab hold of the word "demand" and argue "[t]he City of Richland

9    specifies that not giving TCRY a 'damn thing' was to prevent TCRY from making

10   'some new demand.'" ECF No. 101 at 6. This reading strains credulity and is patently

11   contradicted by the e-mail itself—there is no discussion about preventing TCRY from

12   making a new demand; the comment reflects Wimbish's view that TCRY enters into

13   agreements and subsequently makes new demands.

14        Contrary to Plaintiffs' representations, the comment to not give TCRY "a damn

15   thing aside from funds related to crossing upkeep and signal maintenance" apparently

16   refers to the "Duportail Crossing", as Wimbish notes in the e-mail that he "had not

17   heard anything about movement on Center Parkway"—suggesting he did not know

18   about TCRY's offer of acceptance sent to Berman the previous day.

19        Plaintiffs otherwise assert that Wimbish "went so far as to refer to TCRY as

20   'those TCRY F-ers' when he threatened UP with litigation . . . ." ECF No. 87 at 13.

This statement is patently false. The City of Richland did not threaten UP with litigation in the July 26, 2017 e-mail—although Wimbish does outline that the City may terminate the agreement and enter a new agreement that does not allow TCRY to act as UP's agent. ECF No. 88-37 at 4 ("if UP chooses not to act to remedy the situation, Richland will give formal notice of breach. If UP fails to cure, we will proceed to invoke the City's termination rights" but would "be inclined to offer UP access to the Horn Rapid Spur on virtually identical terms" except that UP would be prohibited "from designating an agent").

Plaintiffs' also point to another statement by Wimbish in an e-mail from Wimbish to Heather Kintzley, an attorney for the City of Richland. ECF No. 87 at 14. In the e-mail, Wimbish forwards the September 13, 2017 e-mail (from Wimbish to Berman) to Kintzley with one sentence stating: "This is the last of 'em." ECF No. 88-44 at 2. Plaintiffs insinuate that this statement is made in reference to UP opting to terminate TCRY as its handling agent and suggest the statement is evidence of retaliatory intent. However, as the City of Richland asserts, this characterization "is wrong." ECF No. 91 at 13.

As the City of Richland explains, the e-mail was sent before UP terminated the agency agreement and the comment was made in reference that it was the last e-mail being forwarded:

> Mr. Wimbish forwarded the email to Ms. Kintzley on September 22, 2017—several months before UP ended its agency relationship with TCRY. TCRY

had made a public records request seeking communications between Mr. Wimbish and UP, so Ms. Kintzley asked Mr. Wimbish to send her responsive emails. He forwarded 17 total emails on September 22, 2017. The "last of 'em" email was the last email Mr. Wimbish forwarded that day. TCRY obtained those emails on October 11 and October 25, 2017, in response to its public records request.

The suggestion that Mr. Wimbish intended to refer to getting rid of TCRY rather than that Mr. Wimbish was informing Ms. Kintzley that he was done sending responsive emails, is absurd in the true context of the email.

ECF No. 91 at 13-14. Plaintiffs have not provided any evidence to discount this explanation and have provided no affirmative evidence of retaliatory intent otherwise. While Plaintiffs may object to being referred to as TCRY F-ers, the moniker only demonstrates the acrimonious relationship between the Parties that evolved over years of disputes.

4. **Conclusion**

In sum, despite Plaintiffs' mostly-bald assertions otherwise, the evidence does not establish the City of Richland took any action out of retaliation against TCRY. Plaintiffs point to (1) an Options List that was not created by the City of Richland and has nothing to do with the Center Parkway crossing, (2) the City of Richland pursuing its contractual rights towards a well-defined goal established in 2001, and (3) off-hand comments – taken out of context – that merely demonstrate the attorney for the City of Richland viewed TCRY as unscrupulous, at most. As such, despite claiming the existence of "express" language detailing such, Plaintiffs have failed to present any

concrete evidence of retaliatory intent. ECF No. 87 at 13.

At least under the lens of summary judgment, the evidence shows the City of Richland, in conjunction with the City of Kennewick, simply proceeded with the long-stated goal of installing the Center Parkway crossing—a goal that was conceived before TCRY even acquired its leasehold interest in the Southern Connection trackage.

Having failed to produce any evidence of retaliatory intent, Plaintiffs have not demonstrated summary judgment is proper. *See Braxton–Secret v. Robins Co.,* 769 F.2d 528, 531 (9th Cir. 1985).

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Plaintiffs Randolph Peterson and Tri-City Railroad Company, LLC's Motion for Partial Summary Judgment (ECF No. 87) is **DENIED**.

2. Plaintiffs' Motion to Strike City of Richland Sur-Reply (ECF No. 104) and Motion to Expedite (ECF No. 105) are **DENIED** as moot.

The District Court Executive is directed to enter this Order and furnish a copy to the parties.

**DATED** May 17, 2019.



THOMAS O. RICE
Chief United States District Judge