UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel., RANDOLPH PETERSON and TRI-CITY RAILROAD COMPANY, LLC, | NO. 2:17-CV-0191-TOR |
| Plaintiffs, | ORDER GRANTING DEFENDANT THE PORT OF BENTON'S MOTION FOR PARTIAL SUMMARY JUDGMENT RE: *QUI TAM* ACTION |
| v. | |
| PORT OF BENTON COUNTY, et al., | |
| Defendants. | |

BEFORE THE COURT is Defendant the Port of Benton's Motion for Partial Summary Judgment to Dismiss Plaintiffs' *Qui Tam* False Claims Act Claims (ECF No. 148). A hearing was held on October 7, 2019. The Court has reviewed the record and files herein, heard oral argument and is fully informed. For the reasons discussed below, the motion (ECF No. 148) is granted.

//

//

ORDER GRANTING DEFENDANT THE PORT OF BENTON'S MOTION FOR PARTIAL SUMMARY JUDGMENT RE: *QUI TAM* ACTION ~ 1

# BACKGROUND[1]

This case arises out of a *qui tam* claim asserted by Tri-City Railroad Company, LLC, ("TCRY") and Randolph Peterson (collectively "Plaintiffs") based on Plaintiffs' contention that Defendant the Port of Benton ("the Port") perpetrated a fraud on the United States Government. The Port is a public port district under Washington law and its primary, and statutorily-defined, purpose is to foster economic growth in its district. ECF No. 148 at 13. TCRY is a private company that operates a short line railroad owned by Plaintiff Randolph Peterson.

The material facts are relatively simple and are not in dispute. The Port acquired land and trackage from the Department of Energy in 1998 (the "Amendment to Indenture" agreement). Pursuant to the Amendment to Indenture, the Port agreed to devote all lease payments or other sources of revenue from the real property and railroad to first cover maintenance of the railroad; any surplus revenue can be used at the Port's discretion. ECF No. 148 at 19. The Port also agreed to honor BNSF Railway Company's ("BNSF") operating rights previously established by contract. ECF No. 152-4 at 8.

---

[1] While the admissible and material facts must be construed in favor of TCRY as the non-moving party, the fundamental facts are not in dispute. Accordingly, the Court cites to the Port of Benton's briefing for many undisputed facts.

The Port first contracted with Livingston Rebuild Center ("Livingston") for the maintenance and operation of the trackage in order to fulfill the Port's duty to maintain the trackage. ECF No. 152-4 at 2. Livingston subsequently assigned its rights and obligations under the agreement to TCRY. In 2002, the Port entered into a new agreement with TCRY to lease to TCRY trackage, a large building, and acreage for a laydown yard for $2,000 a month, subject to periodic consumer price index adjustments. ECF No. 148 at 19; *see* ECF No. 78-4 (2002 Lease Agreement). In return for the minimal rental payment—before the 2002 lease agreement, TCRY was paying $288,000 per year to lease the same property— TCRY agreed to maintain the trackage *at its sole expense*. ECF No. 148 at 19-20. This agreement was in effect at all times relevant to this dispute.

Between 2002 and 2015, the Port leased additional acreage to TCRY for a laydown yard at a reduced rate with the intent of providing additional funding for TCRY to maintain the trackage—over the course of the lease for this property, TCRY paid $2,295,231 in rent while collecting $4,630,186 from its subtenant. ECF No. 148 at 20.

Between 2000 and 2009, TCRY was the only railroad that operated on the trackage. In 2009, BNSF asserted its rights to use the trackage pursuant to its contractual right granted by the DOE long before TCRY came onto the scene. ECF Nos. 148 at 14; 152-4 at 1-2. TCRY requested the Port terminate BNSF's

operating rights, which was within the Port's prerogative. ECF No. 148 at 14. The Port declined, finding such would be determinantal to the Port's stated goal of promoting economic growth. ECF No. 148 at 14-15.

In July 2009, TCRY erected a physical barrier to block BNSF's access; in response, BNSF filed suit against TCRY in the United States District Court for the Eastern District of Washington. *See* ECF No. 152-4 at 4. The Honorable Edward F. Shea held that BNSF and Union Pacific ("UP") had "full rights to operate" on the trackage, and TCRY's lease was subject to those rights. *BNSF Ry. Co. v. Tri-City & Olympia R.R. Co. LLC*, No. CV-09-5062-EFS, 2012 WL 12951546, at *8 (E.D. Wash. Feb. 14, 2012); *see* ECF Nos. 148 at 15; 152-4 at 4. The Court ordered and approved an Operating Plan designating the Port as the arbitrator of disputes between TCRY, BNSF, and UP. ECF No. 148 at 15.

In 2012, the Port applied for and was awarded a Washington State Appropriations grant to complete large-scale improvement projects on the trackage, to which the Port replaced an old, wood-constructed railroad bridge with a steel bridge and upgraded a three-mile portion of curved track by replacing non-conforming ballast (rock), re-aligning the rails, and replacing ties. ECF No. 148 at 21. At this time, the Port became aware of a high percentage of tie failures in the area, to which TCRY attributed to heavier trains operating on the rail line and the non-conforming ballast; according to the Port, the Port later learned that TCRY

deferring maintenance was the source of the problem.[2]  ECF No. 148 at 21-22.

The Port repeatedly requested maintenance records from TCRY, but TCRY

refused.  ECF No. 148 at 22.

In September 2016, TCRY lodged a complaint with the Railroad Retirement

Board's ("RRB") Office of Inspector General fraud hotline alleging that the Port

was defrauding the government by not paying Railroad Retirement Act ("RRA")

taxes and for not paying into the railroad unemployment insurance fund pursuant

to the Railroad Unemployment Insurance Act ("RUIA").  ECF No. 148 at 16.

If the Port were a "covered employer" it would have to pay taxes and pay

into the unemployment insurance fund under the Railroad Retirement Tax Act

("RRTA").  The RRB is the United States entity that determines whether a railroad

is a covered employer; the IRS assesses and collects RRTA taxes and pursues

remedies when an entity fails to pay the required tax.  ECF No. 148 at 11-12.

Importantly, an entity that leases or contracts with another for the operation of the

rail line is not a "covered employer" if the entity (1) does not have a primary

business purpose to profit from railroad activities; (2) does not operate or retain the

capacity to operate the rail line, which is met if (a) another entity is the certified

---

[2]      The Court provides this information for context.  TCRY disputes the cause
of the problems, but the dispute is not material to this Order.

operator of the rail line and actually conducts the railroad service or (b) the entity leases out the rail line and does not retain control over the day-to-day operations of the line; and (3) the operator/lessee of the rail line is already a covered employer or would be found to be covered under the RRTA, the RUIA, and RRA. ECF No. 148 at 13.

In arguing the Port is a covered employer, TCRY represented to the RRB Office of Inspector General that the Port controlled the operations, specifically identifying the Operating Plan, the Port's control over demurrage and tariffs, the Port's negotiations with the City of Richland for railroad easements and crossing, and the Port's undertaking of capital improvement projects on the trackage, among other things. ECF No. 148 at 17.

The RRB looked into the matter and, on April 9, 2018, the RRB reaffirmed its 2001 decision (previously finding the Port was not a "covered employer") and declared that the Port was (still) not a covered employer, finding the Port "did not engage in control over the day-to-day operations of the rail line and does not operate nor has the capacity to operate the rail line" and that TCRY was "a covered employer" that operated the rail line. ECF No. 148 at 18.

In September 2018, the Port applied for a Freight Rail Assistance Program grant and a Freight Rail Investment Bank loan from the State of Washington; in the application, the Port cited to the Amendment to Indenture, this lawsuit, and

TCRY's alleged failure to abide by its maintenance obligations.[3] ECF No. 148 at 22. On January 15, 2018, counsel for TCRY sent a letter to the State, advising it of "potential inaccuracies" in the Port's application, referencing this lawsuit and the Port's alleged failure to comply with the Amendment to Indenture. ECF No. 148 at 23. Despite TCRY raising the alarm, the State of Washington granted the Port's 2018 application. Plaintiffs conceded at oral argument that they have no proof that any federal dollars are involved in the grants.

## PROCEDURAL HISTORY

Plaintiffs brought this action on June 5, 2017, asserting a *qui tam* action under 31 U.S.C. §§ 3729-3737 based on alleged "false or fraudulent claims" and "false records and statements" used "to obtain payment (and double payment) or approval for payment in violation of the Federal False Claims Act . . . ." ECF No. 1 at ¶ 5.2. Because Plaintiffs asserted a Federal False Claims Act cause of action, the United States of America was provided with notice and an opportunity to intervene. *See* ECF No. 2. On May 25, 2018, the United States of America declined to intervene. ECF Nos. 9; 10.

---

[3] The 2018 award is only relevant for demonstrating the State continued to approve applications for State grants in full awareness of TCRY's assertions of malfeasance.

On January 24, 2019, Peterson and TCRY requested the Court enter partial summary judgment holding the Port "liable for retaliating against Peterson and TRCY (for associating with Peterson) for Peterson's petition against the Port for unconstitutional conduct." ECF No. 61 at 2. The Court denied the motion, finding the underlying, complained-of threat to file a counter-claim was based on a "facially plausible concern that TCRY is, indeed, not paying a sufficient amount of [Lease Excise Taxes]" given TCRY was only paying the tax on the minimal amount of rent—which was "grossly disproportionate to the value of the property (at least $25M) at issue"—and not the substantial value of the obligation to maintain the trackage. ECF No. 85 at 21.

On March 22, 2019, Peterson and TCRY requested the Court enter summary judgment against the City of Richland based on alleged retaliation for opposing the Center Parkway crossing project. ECF No. 87. The Court, again, denied the motion, concluding:

> In sum, despite Plaintiffs' mostly-bald assertions otherwise, the evidence does not establish the City of Richland took any action out of retaliation against TCRY. Plaintiffs point to (1) an Options List that was not created by the City of Richland and has nothing to do with the Center Parkway crossing, (2) the City of Richland pursuing its contractual rights towards a well-defined goal established in 2001, and (3) off-hand comments – taken out of context – that merely demonstrate the attorney for the City of Richland viewed TCRY as unscrupulous, at most. As such, despite claiming the existence of "express" language detailing such, Plaintiffs have failed to present any concrete evidence of retaliatory intent.

1 | ECF No. 108 at 20-21.

2 |     Plaintiffs also requested approval from the Court to temporarily dismiss

3 | certain claims and to file an amended complaint to reassert the temporarily

4 | dismissed claims. The Court approved the request in part. ECF No. 85 at 2-6.

5 | Plaintiffs subsequently filed the Third Amended Complaint, which the Court struck

6 | because it went beyond what was requested and approved. Plaintiffs filed the

7 | Fourth Amended Complaint – the operative complaint – on August 28, 2019. ECF

8 | No. 167.

9 |     The Port's motion for summary judgment on Plaintiffs' *qui tam* action is

10 | now before the Court. ECF No. 148.

11 | **STANDARD OF REVIEW**

12 |     A movant is entitled to summary judgment if "there is no genuine dispute as

13 | to any material fact and that the movant is entitled to judgment as a matter of law."

14 | Fed. R. Civ. P. 56(a). A fact is "material" if it might affect the outcome of the suit

15 | under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

16 | (1986). An issue is "genuine" where the evidence is such that a reasonable jury

17 | could find in favor of the non-moving party. *Id.* The moving party bears the

18 | "burden of establishing the nonexistence of a 'genuine issue.'" *Celotex Corp. v.*

19 | *Catrett*, 477 U.S. 317, 330 (1986). "This burden has two distinct components: an

20 | initial burden of production, which shifts to the nonmoving party if satisfied by the

moving party; and an ultimate burden of persuasion, which always remains on the moving party." *Id.*

Per Rule 56(c), the parties must support assertions by: "citing to *particular parts of the record*" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or than an adverse party cannot produce admissible evidence to support the fact." (emphasis added). The court is not obligated "to scour the record in search of a genuine issue of triable fact;" rather, the nonmoving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (brackets omitted) (quoting *Richards v. Combined Ins. Co.,* 55 F.3d 247, 251 (7th Cir. 1995)

Only admissible evidence may be considered. *Orr v. Bank of America, NT & SA*, 285 F.3d 764 (9th Cir. 2002). The nonmoving party may not defeat a properly supported motion with mere allegations or denials in the pleadings. *Liberty Lobby*, 477 U.S. at 248. The "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." *Id.* at 255. However, the "mere existence of a scintilla of evidence" will not defeat summary judgment. *Id*. at 252.

For a *qui tam* action, "[t]o survive summary judgment, the relator must establish evidence on which a reasonable jury could find for the plaintiff." *United*

*States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 330 (9th Cir. 2017) (citation omitted).  "If the facts make a claim 'implausible,' the non-movant must present 'more persuasive evidence than would otherwise be necessary' in order to defeat a summary judgment motion."  *Id.* (citation omitted).

## DISCUSSION

The Port argues it is entitled to summary judgment on Plaintiffs' *qui tam* claim, which involves a direct and indirect *qui tam* action.  ECF No. 148.  The Court agrees.

### A.  **Direct *Qui Tam* Action**

The crux of Plaintiffs' contention for their direct *qui tam* claim is that the Port (1) fraudulently obtained money (the 2012 award from the State of Washington) to perform maintenance without disclosing that they were contractually required to fund the maintenance with revenue from leasing the subject property and (2) committed fraud by failing to maintain the trackage despite agreeing to do so in the Amendment to Indenture.  Ironically, TCRY admits it is TCRY's duty to maintain the trackage pursuant to the 2002 lease agreement.  *See* ECF No. 168 at 10-11.  The Court notes at the outset that the 2012 award was acquired and used for *capital* improvements, not simple maintenance.

Pursuant to the False Claims Act, "Any person who knowingly presents or causes to be presented, a false or fraudulent claim for payment or approval; is

liable to the United States Government for a civil penalty . . . ." 31 U.S.C. §

3720(a)(1)(A). "A claim under the False Claims Act requires a showing of '(1) a

false statement or fraudulent course of conduct, (2) made with the scienter, (3) that

was material, causing (4) the government to pay out money or forfeit moneys

due.'" *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 899 (9th

Cir. 2017) (quoting *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174

(9th Cir. 2006)).

The Port raised a series of issues with Plaintiffs' claim. ECF No. 148.

### 1. **Lack of *federal* funds**

The FCA defines a "claim" as: "any request or demand . . . for money or

property that is presented to an officer, employee, or agent *of the United States*; or

is made to a contractor, grantee, or other recipient . . . *if the United States*

*Government provides or has provided any portion of the money* . . . requested or

demanded." 31 U.S.C. §3729(b)(2) (emphasis added).

The Port contends it has not received any federal funds, so the federal False

Claims Act does not apply. ECF Nos. 148 at 38; 179 at 3-4 (noting Peterson

testified that he simply believes the 2012 grant from the State of Washington

included federal funds). The Port is correct. Plaintiffs have provided no evidence

the Port ever received federal funds based on a false representation. In an attempt

to tie the receipt of the 2012 grant funds (from the State of Washington) to the

United States Government, Plaintiffs (1) identify two alleged actions by the Port: (a) the Port made false certifications to the State of Washington and (b) the Port failed to maintain the trackage while placing lease revenue into the Port's general fund; and then (2) assert that "[t]hese actions patently constitute a fraud on the United States Government and the Department of Energy".  ECF No. 168 at 14. Neither supports Plaintiffs' *qui tam* action.

First, and quite obviously, certifications to the State of Washington do not have any bearing on alleged fraud against the United States Government.  While Peterson testified that he "believes" some of the funding from the State of Washington came from the federal government, there is absolutely no evidence for this, and Peterson could not cite to any in his deposition, *see* ECF No. 180 at 34-35, nor do Plaintiffs cite to any now, despite repeatedly stating the Port received federal funds, *see*, *e.g.*, ECF No. 168 at 18 ("it is apparent that the Port intentionally withheld the truth in order to obtain federal grant funding for capital improvements"; "Dezember signed a Vendor's Certificate on behalf of the Port certifying under penalty of perjury that the federal grant funds totaling $2,029,815.00 were . . . proper charges"[4]).

---

[4]     Plaintiffs cite to ECF No. 153, ¶ 71, which specifically states the payment was from the State of Washington.

### 2. **Remaining elements**

The Court further finds that the Port has conclusively established that Plaintiffs have failed to meet their burden in demonstrating even one of the remaining elements of their direct *qui tam* claim. Although the Court need not delve into a detailed analysis of the remaining issues to address this claim, the Court will do so for the sake of demonstrating the frivolous nature of Plaintiff's other arguments.

Plaintiffs' claim that the Port made false certifications to the State of Washington has no basis in fact. In support of their claim that the Port "repeatedly made factually false certifications to the government by representing that it has complied with the Indenture and the Amendment thereto", ECF No. 168 at 14, Plaintiffs cite, without any pin cite or further explanation, to ECF Nos. 150-5; 150-6; 150-7; and 150-9. As with many of Plaintiffs' claims in their previous motions and submissions to the Court, these citations do not support their claims.

ECF No. 150-5 is a two-page description of the railroad bridge replacement project that does not mention the alleged false statement. ECF No. 150-6 is a **90-page** exhibit with the terms for the 2012 Direct Appropriations Agreement between the Port and the State of Washington. Without a pin cite, there appears to be no such claim in the agreement—upon review, the Court could not find any mention of maintenance of the trackage or any mention of the indenture agreement

or compliance thereof.  ECF No. 150-7 is a one-page voucher that does not mention the alleged false statement.  ECF No. 150-9 is a **41-page** exhibit that appears to be a part of the application for the 2018 grant, which is not the basis for this suit.  Irrespective, the first page of the exhibit specifically states that the Port contracted with TCRY to maintain the trackage and that TCRY has failed to maintain the track—directly contradicting Plaintiffs' claim the Port made a false statement.

Second, Plaintiffs' claim that the Port has placed lease revenue into its general fund rather than devote it to maintain the track, at most, amounts to an argument that the Port breached the Amendment to Indenture agreement.  Interestingly, the Port contracted with TCRY to maintain the trackage.  *See* ECF No. 168 at 14.  However, a mere breach of contract does not give rise to a claim under the FCA.  *See Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1057 (9th Cir. 2011).  Rather than support a claim that the Port intended to defraud the federal government, the evidence clearly shows the Port made an effort to comply by forgoing millions of dollars in lease revenue in exchange for TCRY's promise to maintain the trackage at TCRY's sole expense.  Curiously, Plaintiffs' argument appears to concede that TCRY is in breach of its obligations to the Port to properly maintain the trackage (placing TCRY in essentially the same position as the Port because TCRY is receiving a property interest – the lease – while

failing to maintain the trackage).

Importantly, Plaintiffs do not point to any certification of compliance to the United States government. Nor is there any evidence that the Port intended to defraud the United States overnment by entering into the Amendment to Indenture. Rather, Plaintiffs simply wish to apply a post-hoc claim of fraud based on events that happened *after* the Port received the property and after the Port attempted to comply with its obligations.

In trying to demonstrate the Port made an implied false certification, Plaintiffs again attempt to blur the lines between receiving funds from the State of Washington and obtaining "federal grant funding". ECF No. 168 at 16-17 (for example, characterizing the receipt of payment for the 2012 award from the State of Washington as "federal grant funds"). Plaintiffs argue the Port should have included in its 2012 application (for a capital improvement to the trackage) the fact that the Port is contractually obligated to devote lease payments *first* to maintaining the trackage. ECF No. 168 at 16-17. Even setting the issue of federal funding aside, this argument is patently without merit—the grant was for capital improvements, not maintenance. Further, it is not clear how this would be material (especially in light of the fact that the State of Washington continued to provide funding despite being made aware of such).

Plaintiffs' other examples of the Port's allegedly false statements fare no

better.  *See* ECF No. 168 at 17-21 (alleging the Port: failed to disclose the short line operator was responsible for recruiting new industrial development to the area; represented that the receipt of payment was for proper charges; falsely asserted TCRY was obligated to keep the rail line to the Class 3 FRA standards; falsely asserted that improvements are urgently needed; and failed to disclose BNSF and UP operate "rent free", *inter alia*).  Notably, most of Plaintiffs' arguments on this point are based on the Port's 2018 application, ECF No. 168 at 17-20, but this is not even the basis for their suit (which predates the 2018 application)—not to mention the State still granted the 2018 application with full awareness of Plaintiffs' purported concerns.

Incredibly, Plaintiffs' entire argument that the allegedly false statements were material is limited to the bare conclusions that the Port "knew its misrepresentations . . . were material" and that the Port "acted intentionally to influence the government and persuade it to provide it money for work that it had already promised the DOE it would pay for with lease revenue from the DOE's gift . . . ."  ECF No. 168 at 21-22.  Plaintiffs conflate capital improvements with maintenance, and again conflate receiving funds from the State of Washington with funds from the United States.  ECF No. 168 at 22.  Moreover, Plaintiffs fail to even address the fact that the State of Washington granted the 2018 application after being alerted to the very issues Plaintiffs raise here, including the existence of

this lawsuit.

In sum, Plaintiffs' direct *qui tam* claim is blatantly frivolous, and their learned counsel should have been well aware of this from the start. Indeed, the strained nature of their arguments lends support to a finding that this litigation is vexatious and completely unfounded. Plaintiffs' indirect *qui tam* claim further supports this finding, as addressed in detail below.

B. **Indirect *Qui Tam* Claim**

The crux of Plaintiffs' indirect *qui tam* claim is that Port avoided its obligations to pay the RRA tax and pay into the unemployment insurance fund by lying to the RRB when the RRB was evaluating whether the Port was a "covered employer" in 2016. ECF No. 168 at 25. Specifically, Plaintiffs argue that the Port falsely represented to the RRB that there have been no material changes since the RRB's previous determination in 2001[5] that the Port was not a "covered employer". The Court disagrees.

The False Claims Act contains a provision known as the "reverse false claim" provision, which provides:

Any person who knowingly makes, uses, or causes to be made or used, a

---

[5] Plaintiffs state the decision was from 2000, but it appears the decision was made on October 10, 2001. ECF No. 151-3 (decision dated October 10, 2001). Irrespective, the exact date is not material.

false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government . . . .

31 U.S.C. § 3729 (a)(1)(G). "To sustain a reverse false claim action, relators must show that the defendants owed an obligation to pay money to the United States at the time of the allegedly false statements." *U.S. ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217, 1223 (11th Cir. 2012).

### 1. **Alleged false statements**

Plaintiffs argue the Port made "numerous, knowing false statements to the RRB". ECF No. 168 at 26. Plaintiffs assert: "Most telling is the Port's representation" in 2016 – after TCRY "attempted to invoke the Board's class exemption procedures" – that "there has been no relevant material changes in circumstances warranting Board action, and certainly none requiring invocation of a class exemption" since the RRB's 2001 determination. ECF No. 168 at 26 (citing ECF No. 152-6 at 3). Plaintiffs argue that the Port's representation is false because "the Port's activities and control have drastically change[d]" since the 2001 decision. ECF No. 168 at 25.[6] Plaintiffs then identify what they perceive as

_____

[6] Without any citation to evidence, Plaintiffs disparagingly assert that this "is why the Port refused to respond to the RRB". To the contrary, however, the RRB specifically stated they received responses from the Port, as demonstrated by

relevant, material changes.

First, Plaintiffs point to the Port's 2009 decision "*not* to cancel [the] 1947 Agreement with BNSF and UP" and to "*continue* to allow BNSF and UP to use the trackage for free." ECF No. 168 at 26 (emphasis added). It is unclear how Plaintiffs could believe that maintaining the contractually-determined status quo is an example of a "drastic change" supporting a change in designation. Further, the Port specifically stated in their letter to the RRB that the rights and obligations of BNSF, UP and TCRY have not changed since the 2002 lease with TCRY "even though the precise form of operations each carrier arranges to provide on the line may have been adjusted over the years", which is true. ECF No. 152-6 at 4.

Second, Plaintiffs point to a letter from the Port to TCRY stating that "the railroads will agree upon rules and regulations governing the movement of engines, cars and equipment over the railroad" and directing "the parties who wish to use the Port railroad to enter into an operations agreement covering the use of the Port railroad." ECF No. 168 at 26-27. Plaintiffs also highlight general statements by the Port that it "retains general control, management and

_____

Plaintiffs' own exhibit. *See* ECF No. 169-51 at 5; *see also* ECF Nos. 153 at 14-17, ¶¶ 36-38 (detailing the Port's submissions to the RRB); 170 at 16, ¶¶ 36-38 (Plaintiffs not disputing the fact that the Port responded to the RRB).

ORDER GRANTING DEFENDANT THE PORT OF BENTON'S MOTION FOR PARTIAL SUMMARY JUDGMENT RE: *QUI TAM* ACTION ~ 20

administration of the railroad" and that it "retained overall control and management" of the trackage. ECF No. 168 at 26-27. However, mere governance of general terms of use as the owner of the property at issue does not come close to operating the railroad. Further, these general statements are not evidence of any actual control of the operations, as opposed to mere administration and management of the railroads.

Third, Plaintiffs point to the 2011 Operating Plan, ECF No. 168 at 27, but, in the complained-of letter, the Port specifically cited to the *BNSF v. TCRY* litigation and the Operating Plan, ECF No. 152-6 at 2, so there was full disclosure on this point. In any event, the Operating Plan allowing the Port to approve changes and resolve disputes between TCRY, BNSF, and UP does not demonstrate the Port is operating the rail line. The Port is the owner of the trackage at issue and was simply designated as the official arbitrator between TCRY, BNSF, and UP—which is an unremarkable result given the Port's position as the owner of the rail line. Further, the mere ability to approve changes and settle disputes does not exemplify a "drastic change" that is relevant to the operations of the rail line.

Fourth, Plaintiffs assert that, "[i]n 2015, the Port exerted control over the trackage by determining that UP[,] BNSF, and TCRY all had the right to nonexclusive use of the trackage" and that "the Port asserted control over TCRY's ability to charge tariffs and demurrage", ECF No. 168 at 27, but this

"determination" is merely a recognition of the rights already established (as recognized by the federal courts in 2011)—a far cry from a "drastic[] change". Further, the ability to determine rates as the owner, especially where BNSF and UP had previous rights to use the trackage, does not support a showing that the Port is the operator of the rail line.

Fifth, Plaintiffs argue that (1) "the Port asserted unprecedented control over work performed on the railroad, telling TCRY that it would be using non-union labor for capital improvements"; (2) created the Southern Connections Option List, which contained a *potential* option of selling the railroad; and (3) began negotiating directly with BNSF and UP. ECF No. 168 at 27-28; *see* ECF No. 108 at 8. Plaintiffs assert that this amounts to "exercis[ing] control over TCRY's every move and most importantly, [that this] stymied TCRY's ability to make any meaningful income because the Port refused to allow TCRY to impose tariffs or other fees . . . ." ECF No. 168 at 28. The Court disagrees. Completing capital improvements and governing who works on a project for capital improvements is not operating the rail line. The Options List simply listed selling the line as one *option* (that was not selected) out of fifteen (one of which was to do nothing)— which contradicts Plaintiffs' representation to this Court that the "express reason[] for [the] Southern Connections Options List was to sell the railroad". Further, the Port simply negotiating directly with BNSF and UP is completely irrelevant, as is

Plaintiffs' complaint regarding TCRY's ability to make money.

This falls woefully short of proving a "drastic change" that would warrant the Port's status to change to a "covered employer".

Plaintiffs further argue the merits of their claim that the Port is a covered employer. ECF No. 168 at 35-36. Plaintiffs argue the Port "has a primary business to profit from a railroad" because (1) the Port created the Options List "in an <u>effort</u> to rid itself of TCRY" and (2) the Port "began negotiating directly with" BNSF and UP and "<u>discussed</u> having [] BNSF and UP pay it directly". ECF No. 168 at 35-36 (emphasis added). Plaintiffs assert that carrying on business as a short line railroad (which did not happen) and negotiating with BNSF and UP (which included a mere <u>discussion</u> about direct payment) "<u>would</u>" turn the Port into an entity that has a primary purpose of profiting from railroad activities. ECF No. 168 at 35-36 (emphasis added). This (hypothetical) argument, like Plaintiffs' other arguments, is completely frivolous and not based on the evidence. Notably, the Port generates $4.5 million per year in lease revenue, but only approximately $6,000 per month from the leased trackage; the Port otherwise does not derive direct revenue from railroad operations. *See* ECF No. 150 at 2-3, ¶ 4.

Plaintiffs' final argument under the heading "the operator of the rail line is already covered or would be found to [be] covered under the Acts administered to the Board" is baffling, at best:

1

> The Port admits that it is and would be covered under the act but for the Railroad Ventures exception. It is considered a common carrier by the STB. (Decl. of R. Peterson, Ex. 52, filed herewith). The Port is no longer exempt pursuant to Railroad Ventures and must contributed (sic) pursuant to the RRA.

ECF No. 168 at 36.

In sum, Plaintiffs arguments that the Port made a false assertion to the RRB (which blends with their argument that the Port is a covered employer—which is only incidentally relevant to the actual issue of whether the Port *intended* to defraud the government) is completely frivolous, at best. Indeed, the Plaintiffs repeated attempts to push the issue based on such baseless claims supports a finding of bad faith, if anything. *See* ECF Nos. 150 at 3, ¶ 5; 150 at 5. Notably, Plaintiffs' substantive arguments that the Port is a covered employer have been tried and tested before the RRB (*after TCRY raised the issues asserted here*), who is responsible for this very determination, and it found the argument lacking.

## 2. **Remaining elements and defenses**

Plaintiffs' arguments addressing the remaining elements are even more deficient, as they are based on pure conclusory statements.

First, Plaintiffs argue the scienter element is met based on the bald assertion that the Port "knew that if it honestly answered the questions posed by the RRB that the RRB would find that the Port is a covered employer" and that "[i]nstead, the Port knowingly chose not to answer the RRB's questions and knowingly

minimized the relevant and material changes that have occurred since the RRB's original determination in 2000, as set forth above." ECF No. 168 at 29-30. However, Plaintiffs make no attempt to detail what questions were answered dishonestly. Rather, Plaintiffs, without any other explanation, generally cite to ECF No. 169-46, which is a letter dated December 6, 2017, from the Port's counsel to TCRY's counsel that has nothing to do with the RRB inquiry. Further, the Port responded to the RRB's inquiry and the RRB did not request additional information from the Port. ECF No. 153 at 16, ¶ 38; 170 at 16, ¶ 38 (Plaintiffs do not dispute this fact).

Second, Plaintiffs argue the obligation element is met because "the Port had a duty to make contributions", speculating, without evidence, that "the RRB made its decision without reviewing all of the relevant information before it" and that had the Board considered "TCRY's evidence of the dramatic change in the Port's exertion of control over the railroad, the RRB would have made a different determination". ECF No. 168 at 30-31. Plaintiffs generally cite to ECF No. 169-51 without further explanation. ECF No. 169-51 is the RRB's Response to TCRY's request to supplement the record on appeal to the Ninth Circuit of the RRB's determination that the Port is not a covered employer. This does not provide any affirmative evidence that the RRB did not consider all of the relevant evidence upon which Plaintiffs now rely.

Indeed, as noted above, the RRB specifically reviewed the summary of Plaintiffs' allegations, which mirror the allegations here, including the allegation that (1) the Port asserted the "right to review and approve TCRY's transportation rates"; (2) pursuant to the Operating Plan, "the Port must approve any changes to operations and will make the final determination of any dispute upon the track"; (3) "[t]he Port exerts control over tariffs and demurrage charged on the track"; (4) "[t]he Port exclusively conducts capital improvements on the track, uses its own (non-union) employees for the construction"; (5) "[t]he Port is involved in [the] dispatch of all BNSF unit trains that operate on the track"; (6) "[t]he Port negotiates with other railroads, including the City of Richland Railroad, concerning changes to the track including easements, crossing, and dispatch of BNSF unit trains"; and (7) "the Port and Port employees conduct regular operations and maintenance meeting with TCRY".  ECF No. 150-1 at 5.

Clearly, the RRB was well aware of Plaintiffs' assertions, as the RRB specifically noted that it "reviewed [TCRY's] allegations, and requested additional information from the Port of Benton based on those allegations" *after* receiving TCRY's summary of allegations from the Office of Inspector General.  ECF No. 169-51 at 8-9.

Third, Plaintiffs devote one sentence to their argument that the materiality element is met: "The Port's 2016 statement to the RRB was material because its

sole intent was to influence the RRB to not inquire further into the significant and material changes in the Port's influence and control over the [] trackage."  ECF No. 168 at 31.  Without any other explanation, Plaintiffs cite to ECF No. 169-46 (as above), which is a letter dated December 6, 2017, from the Port's counsel to TCRY's counsel that has nothing to do with the RRB inquiry.  These allegations could not have been material because the RRB was aware of them and still determined the Port was not a "covered employer".

## ATTORNEYS' FEES AND EXPENSES

31 U.S.C. § 3730(d)(4) provides: "If the Government does not proceed with the action and the person bringing the action conducts the action, the court may award to the defendant its reasonable attorneys' fees and expenses if the defendant prevails in the action and the court finds that the claim of the person bringing the action was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment.

The Court finds that the Port has prevailed in the *qui tam* action—the Court need not find the defendants have prevailed on every other claim asserted by the relators.  As noted above, the Court finds the action was clearly frivolous and the evidence supports the finding that the action was also vexatious and brought primarily for the purpose of harassment.  Given the frivolous nature of the claim and the attending briefing, the Court will award attorney fees and expenses for

work pertaining to defending the *qui tam* action.

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1.   Defendant the Port of Benton's Motion for Partial Summary Judgment (ECF No. 148) is **GRANTED**.

2.   Defendant the Port of Benton's request for attorneys' fees and expenses is **GRANTED**.  Within 21 days of this order, the Port of Benton is directed to submit an accounting of the reasonable attorneys' fees and expenses related to defending the *qui tam* action, bearing in mind the Court will closely scrutinize the reasonableness of the time billed. The billing must justify the rate and hours sought.  Block billing is not acceptable.

3.   A response and reply may be filed according to LCivR 7.

4.   The Court will consider the motion for attorney fees and expenses without oral argument on **November 27, 2019**.

The District Court Executive is directed to enter this Order and furnish copies to the parties.

DATED October 8, 2019.



THOMAS O. RICE
Chief United States District Judge

ORDER GRANTING DEFENDANT THE PORT OF BENTON'S MOTION FOR
PARTIAL SUMMARY JUDGMENT RE: *QUI TAM* ACTION ~ 28